UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

| | | |
|---|---|---|
| **KWAN ANDERSON** | * | **CIVIL ACTION NO. 14-1023** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Kwan Anderson, born August 23, 1984, filed an application for supplemental security income payments on June 6, 2011, alleging disability as of May 20, 2011, due to severe depression, anxiety, anger and learning disabilities.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:

**(1) State Agency Report from Pamela D. Martin, Ph.D., dated October 26, 2011**. Dr. Martin assessed claimant for organic mental disorders under listing 12.02 and for substance addiction disorders under listing 12.09 . (Tr. 58). She determined that under the B criteria of the listings, he had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and one or two episodes of decompensation, each of extended duration. (Tr. 57). She found that the evidence did not establish the presence of the C criteria.

In the Mental Residual Functional Capacity ("RFC") Assessment, Dr. Martin found that claimant was moderately limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept

instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 61).

**(2) Records from Ville Platte Mental Health Clinic dated September 23, 2010 to August 4, 2011**. On September 23, 2010, claimant was admitted for depression, anger and getting easily aggravated. (Tr. 216-221). He reported that he drank beer and used crack and Lortab in the past, but denied use of illegal drugs at present. (Tr. 221). He had been arrested about six years prior for cocaine distribution, for which he served two and a half years in jail. (Tr. 224).

Claimant's diagnosis was major depressive disorder. (Tr. 219). He was prescribed individual therapy for depression, anger, history of illegal drug use and medication management. (Tr. 226). He was encouraged to abstain from drug use. (Tr. 235).

On February 2, 2011, claimant's social worker, Patsy Dugas, reported that claimant had missed three scheduled sessions. (Tr. 230). He stated that he was medication compliant, but had not picked up his medications since December, 2010. He reported that he had been drinking three beers a day. He stated that he felt better when he took his medication.

On June 10, 2011, Ms. Dugas reported that claimant had not seen a therapist since February, 2011. (Tr. 228). He presented with an improved affect, and stated that he was doing well on medications. (Tr. 228, 269). He was prescribed Wellbutrin XL, Remeron and Zyprexa. (Tr. 215).

On August 4, 2011, claimant was incarcerated for six months for fighting. (Tr. 267). He presented for medication management. His Global Assessment of Functioning ("GAF") score was 65.

**(3) Records from University Medical Center ("UMC") dated June 17, 2009 to July 27, 2011**. On June 17, 2009, claimant was referred from the detox unit for suicidal thoughts. (Tr. 249, 292-95). The assessment was psychotic disorder, not otherwise specified; alcohol dependence and cocaine dependance. (Tr. 248). His GAF score was 50 the prior year, 30 on admission and 40 on discharge.

**(4) Records from Mamou Health Resources dated May 27, 2010 to September 27, 2011**. On June 8, 2010, claimant complained of headaches, shortness of breath, chest pain and weakness. (Tr. 282). He was 5 feet 11 inches tall, and weighed 211 pounds. His blood pressure was 140/100. The impression was psychotic disorder and hypertension.

On June 22, 2010, claimant was feeling better. (Tr. 280). His blood pressure was 140/90. It was noted that he was non-compliant. The impression was hypertension. He was instructed to decrease caffeine and nicotine intake, and was prescribed Zantac.

A Holter report dated June 25, 2010, was normal. (Tr. 283). ECGs were normal. (Tr. 284-85).

On April 19, 2011, claimant was a lot better. (Tr. 276). He was very calm and rational. The impression was depression, GERD and hypertension.

On September 27, 2011, claimant reported being tired with some anxiety. (Tr. 275). His blood pressure was 140/80. The impression was GERD and hypertension.

**(5) Consultative Examination by Dr. Toyin Bamgbola dated October 8, 2011**. Claimant complained of anxiety, learning disability and depression. (Tr. 297). He also had hypertension and recurrent shoulder "dislocation."

Claimant could dress and feed himself; stand at one time for about one hour and for five to six hours out of a total of eight hours; walk for up to a block, and sit for about an hour. Household chores included sweeping, mopping and vacuuming. His medications included Prozac, Mirtazapine, Zyprexa, Fluoxetine, Bupropion XL, Nexium and Bystolic.

5

On examination, claimant was 69 inches tall, weighed 180 pounds, and his blood pressure was 161/80. (Tr. 298). He had normal ambulatory effort, and was able to get on and off the exam table and up and out of the chair without any difficulty.

On spinal examination, claimant's pulses were normal. He had no swelling, redness or effusion of any joints. Gail was normal. Hand grip strength was 5/5.

Claimant had negative straight leg raise. He could lay straight back on the table and roll from back to side. He could walk on his heels, and refused to walk on his toes. He could squat about 80 to 90 percent of the way to the ground.

Neurologically, claimant was not nervous. He could follow simple and complex directions. His affect was appropriate. Muscle strength was normal.

Claimant had no clinical or significant sensory deficits. (Tr. 299). Cranial nerves were intact. Deep tendon reflexes were normal.

X-rays showed a mild spondylolisthesis at L1-L2 and mild to moderate sacralization at L5.

Dr. Bamgbola's impression was a history of learning difficulties for which claimant was placed in special educational classes as a child. He had no neurological deficits. He had an average level of intelligible discussion and no defective social interaction.

Claimant had a history of reactive depression with suicidal ideation, for which he was seen by a psychiatrist two years prior.  He was on antidepressant therapy with improvement in mental status.  His mental status was normal at the time of examination.  He had a history of recurrent "right shoulder dislocation," but had no defective range of mobility in any of the joints.  He had no gross ambulatory deficit.

**(6) Records from Ville Platte Behavioral Clinic dated August 30, 2011 to February 13, 2012**.  On August 30, 2011, claimant admitted to missing his appointment to pick up medications earlier that month.  (Tr. 327).  He stated that he was doing "okay."  He was educated on the importance of taking medications on a consistent basis to prevent decompensation.

On November 3, 2011, claimant had missed his appointment that morning. (Tr. 325).  He had gained 14 pounds in two months, and said the medication made him eat.  He was provided teaching for strict medication adherence, healthy diet and exercise.  His compliance with medications was "questionable."

On December 9, 2011, claimant was late for his medication pickup, and had had no medicine for a few days.  (Tr. 324).  He admitted to "feeling down" without his medications.  He was instructed on the importance of strict medical adherence to prevent decompensation.

On January 19, 2012, claimant reported that his medications were helpful. (Tr. 320).  He denied depression.

On February 13, 2012, claimant stated that he had run out of medications a few days prior.  (Tr. 319).  He was provided teaching regarding the importance of taking medications as ordered.  He was prescribed Wellbutrin XL, Remeron and Zyprexa.  (Tr. 318).

**(7) Records from Mercy Regional Medical Center dated February 4, 2012**.  Claimant reported that he was walking on the road when his girlfriend drove by him, opened her door and struck him, knocking him to the ground.  (Tr. 332).  He complained of right shoulder pain, lower back pain, and a forehead laceration.  He stated that he used alcohol occasionally and smoked one-half pack of cigarettes per day.

A CT brain scan showed slight focal soft tissue right frontal scalp swelling. (Tr. 337).  A right shoulder x-ray showed no definite acute fracture or dislocation, and a possible old injury of the inferior glenohumeral region.  (Tr. 338).  Lumbar spine views showed a normal lumbar spine, minimal anterior wedging of T11 vertebral body, and minimal scoliosis.  (Tr. 341).  Cervical spine x-rays showed an old fracture deformity of C5 and an associated slight deformity of the anterior-inferior body of C4, 2-mm anterolisthesis of C4 on C5 which was corrected on

extension, and slight interspinous widening of C4-5 and C5-6, especially during flexion. (Tr. 343).

A CT of the cervical spine showed an old fracture deformity of C5 with a mild kyphotic deformity, 2-mm anterolisthesis of C4 on C5 and narrowing of the anterior disc space with a small posterior disc herniation. (Tr. 339). Claimant also had mild posterior disc bulging at multiple cervical spine levels, but no other sign of focal herniation or spinal stenosis. (Tr. 340). The impression was a head injury. (Tr. 336).

**(8) Addiction Severity Index Narrative Report dated March 8, 2012**.

Claimant indicated that he had last used alcohol 13 days prior. (Tr. 348). In the past 30 days, he drank five days, but never had more than a few drinks at a time. He had used cocaine regularly for a period of six years, and had six-year history of ongoing, regular cannabis use. He had used cannabis six days in the past 30.

Claimant reported serious problems with depression in the last 30 days, but was not obviously depressed at the time of the interview. (Tr. 349). He had had serious problems with anxiety in the past 30 days, and was clearly anxious at the time of the interview. He appeared to have a moderately severe psychological or emotional problem, and treatment was recommended.

**(9) Claimant's Administrative Hearing Testimony**.  At the hearing on December 4, 2012, claimant was 27 years old.  (Tr. 34).  He testified that he weighed 215 pounds.  He attended school through the eighth grade.  (Tr. 35).  He had last worked in 2008 as a construction laborer, and had picked potatoes on a farm prior to that.

Regarding complaints, claimant reported that he had neck pain and depression.  (Tr. 36).  He stated that he no longer had a problem with drugs or alcohol.  (Tr. 36, 41).  Additionally, claimant complained that he was sometimes confused.  (Tr. 44).  He also said that he had stomach trouble, which was improving.  (Tr. 45).

Claimant testified that his medicine helped him.  (Tr. 41).  He said that he went to mental health every 30 days, and attended classes at a drug treatment facility every two weeks.  (Tr. 37, 39).

As to activities, claimant testified that he went to the grocery store with his aunt and washed dishes for her.  (Tr. 37-38).  He stated that he visited with people.  (Tr. 37).  He also watch TV and listened to the radio.  (Tr. 38).

Regarding restrictions, claimant stated that he had problems with walking because of left knee trouble.  (Tr. 39).  He reported that he could stand up a little.  (Tr. 40).  He said that he had trouble lifting because of arm problems.

**(10) Administrative Hearing Testimony of Richard H. Galloway, Vocational Expert ("VE")**. Mr. Galloway classified claimant's past work as a pipe fitter helper as heavy with a specific vocational preparation (SVP) of three (semi-skilled), and sweet potato picker, which was medium and unskilled. (Tr. 47). The ALJ posed a hypothetical in which he asked the VE to assume a claimant of the same age, education and work experience, who was limited to medium work, and restricted to simple, unskilled work in a low-stress work environment, meaning no production-like quotas, no more than occasional contact with the public, no close cooperation with coworkers, and jobs involving working primarily with things, rather than people. (Tr. 47-48). In response, the VE testified that claimant would be able to return to his past work as a sweet potato picker, as well as other jobs, including equipment cleaner, of which there were 842 jobs statewide and 162,593 nationally; locker room attendant, of which there were 175 jobs statewide and 12,232 nationally, and housekeeper, of which there were 4,738 jobs statewide and 248,443 nationally. (Tr. 48).

    The ALJ then asked the VE to assume that because of claimant's condition, he would miss work on an irregular basis, but up to at least two to three days a month. (Tr. 49). In response, Mr. Galloway testified that no jobs would be available. When claimant's attorney asked whether any work would be available

if claimant could not perform one and two-step instruction, the VE responded that no jobs would be available.

**(11) The ALJ's Findings**. Claimant argues that the ALJ erred in relying on the vocational expert's opinion in light of his multiple severe impairments.

The ALJ found that claimant's hypertension, disorder of the lumbar and thoracic spine, obesity, history of substance abuse, borderline intellectual functioning and depressive order were severe impairments. (Tr. 20).

As to claimant's spine problems, the ALJ observed that a right shoulder x-rays showed no acute fracture, and a cervical CT showed and old fracture deformity with "mild" kyphotic deformity, anterolisthesis of C4 on C5, narrowing of the anterior space with a "small" posterior disc herniation, and "mild" posterior disc bulging at multiple levels. He found that although there were findings, this impairment did not appear to cause "more than a minimal impact on the claimant's ability to perform work-related activities," citing *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). These findings are supported by the diagnostic tests and Dr. Bamgbola's report. (Tr. 298-99; 336-43).

Regarding claimant's knee, the ALJ noted that he had not presented any evidence to support a severe medically determinable impairment to his knee. (Tr. 20). This is supported by the report from Dr. Bamgbola, who found no limitations

as to claimant's knee. (Tr. 298). As the ALJ's findings are supported by the medical evidence, they are entitled to deference.

Regarding claimant's mental impairments, the ALJ evaluated them under listings 12.02 (organic mental disorders), 12.04 (affective disorders), and 12.09 (substance addiction disorders). 20 C.F.R., Pt. 404, Subpt. P., App. 1, §§ 12.02, 12.04, 12.09. (Tr. 21). He observed that claimant reported in June, 2011, that he was doing well on medication, and that he had not seen a therapist since February, 2011. (Tr. 21, 228). On October 8, 2011, Dr. Bamgbola noted that claimant could follow simple and complex instructions, had appropriate affect, and his mental health status was normal. (Tr. 298). On September 30, 2011, claimant's affect was appropriate, he denied side effects and stated he was doing okay. (Tr. 327).

The ALJ further observed that claimant had no changes until December, 2011, when he reported that he had had no medication for a few days because he forgot to pick it up. (Tr. 21, 324). But, by the next month, he was doing okay with medication, and he denied depression. (Tr. 320). If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).

As to the "B criteria,"[1] the ALJ agreed with Dr. Martin's findings that claimant had mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties regarding concentration, persistence or pace, and had experienced one to two repeated episodes of decompensation, each of extended duration. (Tr. 22, 60). However, because claimant's mental impairments did not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, each of extended duration, he found that claimant did not satisfy the paragraph B criteria to establish a mental impairment. (Tr. 22). He also found that the evidence failed to establish the presence of the C

---

[1] Section 12.00 of the listing for mental disorders requires that a claimant meet the diagnostic description in the introductory paragraph *and* the criteria of both paragraphs A and B (or A and C, when appropriate) are satisfied. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(A). The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. *I*d. The B criteria require at least two of the following: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation, each of extended duration. Paragraph C requires medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following: (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate, or (3) current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00, ¶¶ B, C.

criteria.  As the ALJ's findings are supported by Dr. Martin's report, it is entitled to deference.

Additionally, the record reflects that claimant was non-compliant with his medication and treatment.  On February 2, 2011, claimant's social worker, Ms. Dugas, reported had missed three scheduled sessions, and that he had been drinking three beers a day.  (Tr. 230).  While he stated that he was medication compliant, he had not picked up his medications since December, 2010.  Additionally, Ms. Dugas reported on June 10, 2011, that claimant had not seen the therapist since February, 2011.  (Tr. 228).

Also, on February 13, 2012, claimant stated that he had run out of medications a few days prior.  (Tr. 319).  Additionally, he was repeatedly non-compliant with his blood pressure and therapeutic medications.  (Tr. 280, 325).  Further, he was late picking up his medications on multiple occasions.  (Tr. 324, 325, 327).

It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685 n. 4 (5th Cir. 1990).  For this reason alone, claimant would not be entitled to recover benefits.

Claimant further argues that the ALJ erred in assessing his residual functional capacity. The ALJ found that claimant was able to perform medium work, except that he was restricted to simple, unskilled work in a low stress environment such as no production line quotas, occasional contact with the public, no close cooperation with co-workers and working with things rather than people. (Tr. 22). In making this assessment, the ALJ considered the combined effects of claimant's hypertension, musculoskeletal limitations and obesity. Based on the diagnostic studies and Dr. Bamgola's report, he determined that claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible. As the ALJ's findings are supported by the medical records, they are entitled to deference.

As to claimant's alleged mental impairments, the ALJ gave weight to Dr. Martin's opinion in which she found that claimant had moderate limitations in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the

16

general public; accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 23-24, 60-61). He also considered the report by claimant's aunt, Audrey Gradney, who reported that he had "bad nerves" and got "very depressed." (Tr. 186-93).

In his hypothetical to the vocational expert, the ALJ included limitations to simple, unskilled work in a low-stress work environment, meaning no production-like quotas, no more than occasional contact with the public, no close cooperation with co-workers, and jobs involving working primarily with things, rather than people. (Tr. 47-48). Based on these limitations, the VE testified that claimant would be able to past work as a sweet potato picker, as well as an equipment cleaner, locker room attendant and housekeeper. As the ALJ's hypothetical to the vocational expert reasonably incorporated all disabilities of the claimant recognized by the ALJ, and the claimant or her representative had the opportunity to correct deficiencies in the ALJ's question, the ALJ's findings are entitled to deference. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED***

*SERVICES AUTOMOBILE ASSOCIATION*, **79 F.3D 1415 (5TH CIR. 1996).**

Signed July 27, 2015, at Lafayette, Louisiana.

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE